ROBINSON, WATSON & COMPANY v. SAMUEL T. KINDLEY.

1. BROKERAGE; *Commission; Modified Agreement.* K. employed land brokers to procure a purchaser for his land. A condition of the employment was that if he sold the land without the intervention or assistance of the brokers, they would not be entitled to commission. K. began negotiations with S. for a sale of the land, of which the brokers had notice, but before the sale had been effected, the brokers procured and produced purchasers for the land, when K. stated that he had made a definite proposal to S. to sell, and was then looking for an answer through the mails from him. It was then agreed among all the parties to wait five days for the answer expected, and in case the proposal was not accepted by S., that the proposed purchasers would take that and another tract recently acquired by K. Within that period K. received a letter from S. accepting his proposition, and the land was conveyed to S. in substantial compliance with the proposition. *Held,* That the second or modified agreement superseded the former one, and under it K. might sell the land to S.

within five days without liability to the brokers for commission ; and as S. accepted K.'s proposal and agreed to purchase the land within that time, the commission of the brokers was not earned.

2. ——— *Evidence; No Error.* The purpose of S. is to be determined from the terms of his letter of acceptance read in the light of the surrounding circumstances, and the court did not err when it refused to allow him to state what his secret intentions were when the letter was written.

### Error from Osborne District Court.

*Robinson, Watson & Co.* brought this action against *Samuel T. Kindley* to recover a commission for the sale of several tracts of land, alleging that they procured a purchaser in compliance with the terms of a contract made with the defendant. At the February Term, 1885, the parties waived a jury, and submitted the cause to the court for trial. Findings of fact and of law were made, which are as follows:

"1. The plaintiffs are a firm of real-estate brokers, doing business at Osborne, Kansas.

"2. On or about the 5th day of May, 1884, the defendant was the owner of the land described in the first and second counts of the plaintiffs' petition, and at said time employed the plaintiffs as such brokers to procure for him a purchaser for said lands within six months therefrom, and subject to rise or fall in price. The price set for the land in the first count described was $1,600, and one-third of the crop was to go with the land if sold in two months, and plaintiffs were to have a commission of 5 per cent. for selling same. The price for the land described in the second count was $6,300, and plaintiffs were to have $300 for selling same. There were other conditions, as to the terms of payment and so on, agreed upon at the same time, and the defendant reserved the right to sell the land himself without paying the plaintiffs a commission unless the purchase was obtained through plaintiffs or their advertisement, and provided that defendant should not sell at less prices than those given to plaintiffs.

"3. About July 1, 1884, defendant purchased the land described in the third part of the petition, and soon after such purchase had a conversation with a member of plaintiffs' firm, in which defendant said if plaintiffs brought a purchaser over for the other land, and could include that tract in the sale, he would pay them a commission of 5 per cent., but made no definite contract to employ plaintiffs to sell this tract.

"4. About June 20 to 25, 1884, a Mr. Shafer, then residing in Missouri, was at defendant's residence described in said second count, and defendant commenced negotiating with him for the sale of said last-mentioned tract, and about June 26, 1884, defendant informed plaintiffs of such negotiations, and requested plaintiffs not to seek a purchaser for said tract for a couple of weeks, until he could know the result of such negotiations, to which plaintiffs assented.

"5. On July 14, 1884, a member of plaintiffs' firm took two land-seekers, Walrath and Hand, to defendant's premises to look at the land, and they looked at all the land described in the petition, and desired to buy all the land at the prices set upon the same by defendant to plaintiffs, the tract in the third count described being then priced at $1,800.

"6. The defendant informed Mr. Robinson, of plaintiffs' firm, who was present, in the presence of Messrs. Walrath and Hand, that he had by letter made a definite proposition to Mr. Shafer, then at his home in Missouri, for the sale of the second tract, (described in second count;) that he was expecting an answer, and that he felt bound by his proposition and could not then sell that tract.

"7. It was then agreed between defendant, Robinson, Walrath and Hand that they would wait until Saturday, July 19, 1884, for defendant to get an answer from Shafer, and that if defendant received no answer by that time, or if Shafer did not take the land, then Walrath and Hand should take the land at said prices, the terms of payment not being definitely specified; and in any event Walrath or Hand, or one of them, should take the first tract, described in first count, and that Kindley should go to Osborne on said July 19, to make the deed or deeds and to inform them whether or not he had heard from Shafer. In making this agreement the parties did not contemplate any conveyance of the land from defendant to Shafer, or the execution of any formal contract to sell and purchase before the 19th, but such an acceptance or rejection of the proposition in defendant's letter as one farmer would ordinarily make to another.

"8. The defendant's letter to Shafer was dated July 7, 1884, was mailed the next day, and is as follows:

"'Downs, July 7, 1884.

"'Mr. John Shafer—*Sir:* Mr. Fink came down to my place and said that you sent $10 in money to pay on my land. That is not enough to pay down. In fact, there should be some written agreement when I give possession, and that I should have the crop this year. But since Fink was over to see me there has been a man here and offered

me $200 more, making $6,500. He wants the place very bad. He said it was the nicest place he had seen since he left Illinois. I told him I would not let him have it until I heard from you again; that you were here first, and you should have the first chance of the land at $6,500; then, if you did not take it, he might have it. I told him $6,300 was what you offered me, but I had not agreed positive to keep it for you. I told you that might spoil a trade for somebody else. I would not bind myself to keep it for you; but you would have got the place if you had sent more money and signed a contract that I was to have the crop this year. Now if you want the place at what the other man offers — $6,500 — you can have it. This must be our agreement, that I have until Christmas to make sale of my stock and grain and move off of the place. You can have possession of one house, one stable, one well, one hog lot, one pasture, plow, and sow wheat any day you wish it. Now if you see fit to pay $300 or $500 down, I will sign a contract that you shall positively have the land. Then you pay me $3,000 or $3,500 down when you get the deed; then I will wait two years for one-third of the balance; then two years longer for the next third; then two years longer for the last third; that makes six years' time on a part of it. You must pay the interest once a year. If I have any plowing or other work done on the place before we make our contract you must pay me just what it cost me, but I will not have any great amount of work done, for you or the other man will get the place. My wife would rather I would not sell, and my neighbors tell me not to sell. They say my place in two years from now will bring $10,000. But I am going to sell now. People are not quite done cutting wheat yet. We have had some nice rains since you were here. The prospects for oats and corn are better than for the wheat and rye. My fruit trees, yard trees and grove are looking fine—cannot be beat. Now if this suits you, write immediately, and we will have the business fixed up according to law by a lawyer. We can do this without your coming out. But I would some rather you would come; it would save writing backward and forward. It could be done quicker if you were here yourself. Write soon. Direct to Samuel T. Kindley, Osborne county, Downs, Kas. If you don't come out, and you want Fink to do the business for you, you must write a letter just the same as you write to me, and at the same time. Yours truly, S. T. KINDLEY.'

"9. Shafer's reply thereto was dated and mailed at Bethel, Mo., July 11, 1884, and is as follows:

"'BETHEL, MO., July 11, 1884.

"'S. T. KINDLEY—Sir: I received your letter and was much surprised, as I had sold out and was just finishing up my business, and now I will be ready to start in two or three weeks. I thought the understanding was you would keep the farm for me; and when I got home I sold out right away, and seeing that Fink was going out, I thought it would be the best chance to pay $10 to insure me the first chance, because I want the farm and will be there with my family in two or three weeks. Now about having work done on the farm, I would rather you would not have more work done than you can help, as I intend to be there in time to put out the crop myself after we made the bargain. Hoping this being satisfactory until we see each other again.

I remain, JOHN SHAFER,

Bethel, Mo., Shelby Co.

"'P. S.—If this is not satisfactory, or if you think you cannot wait two or three weeks until I come out, and so we can make out in person, you will please let me know as soon as convenient.'

"10. July 17th the defendant wrote and mailed to Shafer the following letter in reply to the above:

"'JULY 17, 1884.

"' MR. JOHN SHAFER—*Sir:* If you want my place at the price I told you in my other letter I will have to know it soon, and have some money on it, and have a written contract about my reserving the crops this summer. The other man that was here since you were here, went back to sell out. He wants the next chance after you, at $6,500. There were two men here last Monday from Minnesota. One of them bought one of my upland farms; the other one wants all the balance of my land together; said he would pay cash for the whole amount, but I don't care whether it is all cash or not; rather let a part of it stand at 10 per cent. I cannot wait two or three weeks, for in this time they might buy some other land, and I want to sell now while I have time to do up my business before winter. Yours truly,     S. T. KINDLEY,

Downs, Osborne Co., Kas.'

" On the above last-named letter is the following blank indorsement: 'MR. SHAFER—*Sir:* Don't delay one hour if you want my farm.'

"11. July 19, 1884, Watson, a member of plaintiffs' firm, went to defendant's residence with Walrath, and Walrath was and expressed himself to the defendant to be able, ready and willing to buy the first and second tracts according to the terms and for the price which plaintiffs had undertaken to sell them for, and to buy the third tract for $1,800, but would not consent to take the first tract alone unless the crop was included in the sale. The defendant refused to convey the second tract to Walrath, but offered to convey the first tract, according to the terms upon which he had authorized plaintiffs to sell it, that is, without the crop, more than two months having elapsed since he had given plaintiffs the agency.

"12. July 23, 1884, Shafer arrived at the depot at Downs, Kansas, the nearest station to the Kindley farm, with his family and household goods, and on the next day moved a portion of his household goods into a building on the second tract of Kindley's farm.

"13. July 26, 1884, the sale of the second tract from Kindley to Shafer was fully consummated, in substantial compliance with the proposition in Kindley's letter to Shafer of date July 7, 1884, and on the same day Kindley and wife executed to Shafer a deed for said land. Shafer paid Kindley $6,500 for said land.

"14. Shafer's letter to Kindley of date July 11, 1884, was intended as an acceptance of the proposition in Kindley's letter to Shafer of date of July 7, 1884, and conveyed an expression of his intention to take the land, as the defend-

11 — 36 KAS.

ant, Robinson, Walrath. and Hand reasonably contemplated in their agreement of July 14, 1884."

### CONCLUSION OF LAW.

"The plaintiffs cannot recover in this action."

A motion for a new trial was made, the grounds of which were that the findings and decision were not sustained by sufficient evidence and were contrary to law, and also for errors of law occurring at the trial. This motion was overruled, and judgment given in favor of the defendant. The plaintiffs bring the case here.

*R. G. Hays,* and *E. F. Robinson,* for plaintiffs in error.

*Ellis & Ellis,* for defendant in error.

The opinion of the court was delivered by

JOHNSTON, J.: Two reasons are assigned for a reversal of the judgment of the district court: first, that its conclusion of law is not sustained by the facts; and second, that competent and proper testimony offered by the plaintiffs at the trial was excluded. None of the testimony is preserved, and the facts stated by the court must be accepted here. There is no real controversy regarding the agreements between plaintiffs and defendant. The first agreement was made about the 5th day of May, 1884, by which the defendant employed the plaintiffs as brokers to procure purchasers for two tracts of land within six months, at a stated price and for a stipulated commission. One of the conditions of that agreement was, that if the defendant sold his land during that time without the intervention or assistance of the plaintiffs, no commission would be paid them. The defendant began negotiations with a resident of Missouri, named Shafer, about June 20, 1884, for the sale of his land; and of these negotiations the plaintiffs had notice. On July 14, 1884, and before a conclusion had been reached between Shafer and the defendant, the plaintiffs brought two persons who were ready to purchase not only the lands included in the agreement first made, but also another tract purchased by defendant about July 1, 1884.

The defendant then informed plaintiffs and the proposed pur-
chasers that he had sent a definite proposition by mail to Mr.
Shafer to sell a portion of his land, and was looking for an
answer, and hence could not sell that portion. Instead of
taking the other tracts, or of insisting upon a sale of all the
land, it was agreed by the plaintiffs that they would wait
until July 19, 1884, to enable the defendant to hear from
Shafer, and if Shafer did not then accept the defendant's
proposition a sale of all the defendant's land, including the
tract last purchased by him, should be made to the pro-
posed purchasers. This modified agreement superseded the
former one, and under it the defendant's reserved right to sell
for himself was extended to July 19. The letter containing
this proposition to Shafer was dated July 7, 1884, and mailed
the next day, and Shafer's letter in reply was dated and
mailed on July 11, 1884, and was received by the defendant
before July 17, 1884, and just what was intended by Shafer's
letter, and whether it constituted an acceptance of the defend-
ant's proposition, is the actual controversy in the case. It ·
will be noticed that this letter was written and mailed before
the time when the plaintiffs procured and produced purchasers
for the defendant's land; and the findings also disclose that
for the defendant to make compliance with the modified
agreement of July 14, it was enough that an agreement had
been reached between himself and Shafer to sell and purchase
the land. It was not necessary that the transaction should be
fully consummated, nor was it in the contemplation of the
parties, as the court finds, that a conveyance should be made,
or that a formal agreement should be executed. The defend-
ant's letter of July 7 made a distinct and definite proposition
to sell to Shafer, the terms of which evidently differed some-
what from an earlier proposition that had been made. In
his letter Shafer expresses surprise in regard to the change of
the terms, but he distinctly says, "I want the farm, and will
be there with my family in two or three weeks." The court,
after hearing the evidence, (which is not before us,) held that
the letter constituted an acceptance of the defendant's pro-

posal, and found that it was such an acceptance as the parties contemplated in their agreement of July 14, 1884, and we are bound to presume that this finding was made upon sufficient evidence.

Shafer is a farmer, who is evidently not skilled in the use of language, and his letter does not very clearly state his purpose; but in the absence of the evidence, we are unable to say that the findings and conclusion of the court are erroneous. The subsequent conduct of Shafer to some extent confirms the theory of acceptance. He came on from Missouri at once, arriving at Downs, in Osborne county, the nearest railway station, on July 23, 1884, and instead of stopping to make further negotiations with the defendant, proceeded at once to move his goods on and take possession of the land for which he had been negotiating. Three days afterward the defendant and wife executed a deed to Shafer for the price required in defendant's letter of July 7, and the bargain was fully consummated in substantial compliance with the terms then proposed by the defendant. It is claimed that the latter part of Shafer's letter, in which he says, "Now about having work done on the farm, I would rather you would not have more work done than you can help, as I intend to be there in time to put out the crop myself after we *made* the bargain," indicates that the bargain was not closed. This was Shafer's reply to the statement of defendant, made in his letter of July 7, that all plowing or work done on the place before the contract was made should be paid for by Shafer, and the direction given to defendant not to continue plowing, or not to have more work done, is not inconsistent with an intention on Shafer's part to take the land. It is true, he uses the words "After we made the bargain," and in the postscript of the letter he says that "If this is not satisfactory, or if you think you cannot wait two or three weeks until I come out, and so we can make out in person, you will please let me know as soon as convenient." It is not improbable that the words "made" and "make out" were used with reference to the formal execution of the conveyance and

the final consummation of the transaction, and this the court finds was not within the contemplation of the parties in making the second agreement.    Looking at the correspondence alone, we would be in considerable doubt in regard to whether Shafer's letter constituted an acceptance; but the facts have not been presented to us as they were to the trial court, and hence we do not feel warranted in disturbing its findings.

An objection is made to the refusal of the court to permit Shafer to state what his intentions were in writing the letter of July 11, 1884.    The court was called on to determine, not what Shafer secretly intended, but rather what purpose the letter, read in the light of surrounding circumstances, indicated.    The witness was not asked to decipher any of the characters employed, nor to give the meaning of any provincial or peculiar words used in his letter.    He was asked long after the letter was written to state what his secret intentions were when he wrote and sent it, and this was not permissible.    (1 Greenl. Ev., § 277.)

The judgment of the district court will be affirmed.

HORTON, C. J., concurring.

VALENTINE, J: With very grave doubts, I concur.